# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3062

_____

Phillip D. Armstrong; Leila R. Armstrong; Filco Incorporated,

*Plaintiffs - Appellants*,

v.

Berco Resources, LLC; Encore Acquisition Company, doing business as Encore Operating LP,

*Defendants - Appellees*.

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: October 23, 2013
Filed: May 15, 2014

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Phillip D. Armstrong, Leila R. Armstrong, and Filco Incorporated sought a declaratory judgment quieting title to an interest in the Bakken formation that Phillip

Armstrong purchased from Berco Resources, LLC.[1] Armstrong also sued Encore Operating LP for breaching a Letter Offer—under which Encore offered to purchase Armstrong's interest in the Bakken formation—and for trespassing on, and converting the oil and gas attributable to, Armstrong's interest. Berco counterclaimed, seeking a declaration that the recorded Assignment and Bill of Sale under which Armstrong received his Bakken interest from Berco was null and void because Armstrong altered it before he recorded it. The district court[2] granted summary judgment for Encore on Armstrong's breach of contract claim and for Berco on its counterclaim. After a trial, the district court dismissed Armstrong's quiet title, trespass, and conversion claims because the court found that Armstrong received a wellbore-only interest from Berco. Armstrong appeals, and we affirm.

I.

In March 2001, Armstrong contacted Berco and offered to purchase Berco's interest in two wells, the Thompson 8-34 (the "Thompson well") and the USA-Yttredahl 33-43 (the "Yttredahl well").[3] On May 3, 2001, Berco replied with a Purchase and Sale Agreement ("Purchase Agreement"), which offered to sell Armstrong Berco's "captioned wells" for $50,000. The Purchase Agreement provided that "Berco will convey the interests using an Assignment and Bill of Sale form." Armstrong signed the agreement and returned it to Berco.

---

[1]Phillip Armstrong later conveyed one-half of his interest in the property he received from Berco to Filco Incorporated and the other half to himself and his wife, Leila Armstrong, as joint tenants. For ease of explication, we refer to Phillip Armstrong individually and the appellants jointly as "Armstrong."

[2]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

[3]The parties refer to this well as "Ytterdahl," "Ytteredahl," and "Yttredahl," and number it as "33-34" and "33-43." The parties do not dispute that all references are to the same well. For clarity, we use "Yttredahl" and "33-43."

On May 23, 2001, Berco sent Armstrong executed copies of the referenced Assignment and Bill of Sale ("Assignment"). This document provided that it was "subject to the provisions of the [Purchase Agreement] dated May 3, 2001 between Phillip D. Armstrong and Berco." Armstrong signed the Assignment and sent one copy to Berco.

Although Berco's May 23 letter to Armstrong indicated that Berco would record the Assignment with the Office of the Register of Deeds, the document was never recorded. Instead, on May 31, Armstrong recorded the copy of the Assignment that he retained. Before recording that copy, Armstrong altered it by adding a description of the property on which the Thompson and Yttredahl wells are located.

In January 2002, Berco assigned its right, title, and interest in all oil and gas properties it held—including whatever interest it retained after the transfer to Armstrong—to Westport Oil and Gas Company, L.P. Encore Operating LP is the successor in interest to Westport.

In March 2008, Encore sent Armstrong a Letter Offer. In the letter, Encore made a "non-binding offer to acquire all right, title and interest in and to the USA-Yttredahl # 34-43 . . . and all leasehold interests . . . owned by Phillip D. Armstrong . . . in the NW/4—Sec. 34." In exchange, Encore offered to grant Armstrong a one-percent overriding royalty in the spacing unit on which Encore planned to drill a well. The Letter Offer provided that it was "subject to title review." Armstrong signed and returned the Letter Offer.

In May 2008, Encore received a title opinion that raised questions about Armstrong's ownership interest in the land on which the Yttredahl well is located. In September 2008, Encore began to drill a horizontal well, as described in the Letter Offer. That well, the Charlson 14X-35H (the "Charlson well"), was completed in

October 2008. The Charlson well produces from a spacing unit that encompasses Section 34, the section on which the Yttredahl well is located.

In November 2008, Armstrong sent a letter to Encore with an executed assignment of his ownership interest in the Yttredahl well. Armstrong also requested that Encore assign him the one-percent overriding royalty, as allegedly agreed to in the Letter Offer. Encore responded that it could not assign Armstrong the overriding royalty because Encore was unable to "tie the pertinent leases (leasehold) back to [Armstrong's] ownership." The letter informed Armstrong that the assignment he received from Berco "could be interpreted as a wellbore (only) assignment—limited to Bakken production from the [Yttredahl] well." Encore advised Armstrong that to receive the overriding royalty, he must clear up the "ambiguities and inconsistencies . . . in order to establish leasehold title." Armstrong contacted Berco and the federal Bureau of Land Management, but both informed him that his transaction with Berco transferred a wellbore-only interest, and did not include a transfer of a leasehold interest.

In February 2010, Armstrong sued Berco and Encore. He sought a declaration quieting title to a leasehold interest in the Bakken formation, not limited to the two wellbores. He argued that Encore breached the Letter Offer by failing to assign him the one-percent overriding royalty in the spacing unit from which the Charlson well produced. Armstrong further alleged that Encore trespassed on, and converted the oil and gas attributable to, his interest in the property underlying the Yttredahl well. Encore answered that the failure of a condition precedent—receipt of a satisfactory title opinion—prevented the Letter Offer from becoming an enforceable contract. Berco counterclaimed, seeking a declaration that the altered Assignment that Armstrong recorded was null and void. All parties moved for summary judgment.

The district court granted summary judgment for Encore on the Letter Offer breach-of-contract claim, reasoning that the "offer was 'subject to' or contingent on

a title review," which "was a condition precedent to the formation of a contract." Concluding it was undisputed that Armstrong unilaterally altered the Assignment prior to recording it, the district court granted summary judgment for Berco, ruling that "the modified [Assignment] as recorded by Armstrong . . . is null and void on its face." The court denied summary judgment on Armstrong's quiet title, trespass, and conversion claims because "an ambiguity exists concerning the conveyance documents and the intention of the parties at the time the agreements were entered into."

After a bench trial, the district court ruled that Armstrong failed to meet his burden of proving that the Purchase Agreement and the Assignment conveyed to him an interest in the underlying oil and gas leases. The court found that "[c]ustom and usage, along with Berco's stated intention to convey only an interest in the two wellbores, demonstrate[s] that the [assignment from Berco] was intended as a wellbore-only assignment." The court also ruled that Armstrong's trespass and conversion claims were without merit because Armstrong was unable to demonstrate that he had an interest in the properties beyond the wellbores.

## II.

## A.

The parties appear to agree that this diversity case is governed by North Dakota law, given that the contracts at issue were made in North Dakota, transferred property interests located in North Dakota, and were to be performed in North Dakota. *See Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 791 n.3 (8th Cir. 2009). In North Dakota, "deeds that convey mineral interests are subject to the general rules governing contract interpretation." *Gawryluk v. Poynter*, 654 N.W.2d 400, 403 (N.D. 2002). "When the language of a deed is plain and unambiguous and the parties' intentions can be ascertained from the writing alone, extrinsic evidence is

inadmissible to alter, vary, explain, or change the deed." *Id*. "A contract is ambiguous when rational arguments can be made for different interpretations." *Id*. at 404. Under North Dakota law, "[s]everal contracts relating to the same matters between the same parties and made as parts of substantially one transaction are to be taken together." N.D. Cent. Code § 9-07-07.

The principal dispute in this case is whether the Purchase Agreement and the Assignment, taken together, transferred to Armstrong (1) a leasehold interest in the property on which the Thompson and Yttredahl wells are located, or (2) a wellbore-only interest. If Armstrong took a leasehold interest, then he would have the exclusive right to exploit the minerals on the land underlying the Thompson and Yttredahl wells. *See* Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 569, 575, 1225 (9th ed. 1994). If, on the other hand, he took a wellbore-only interest, he would have the exclusive right to only the wellbores—the physical holes in the ground—and the production of minerals through those wellbores. *See id*. at 1207.

1.

The Purchase Agreement's granting clause states that "[t]his transaction will only cover all of Berco's interest in the two wellbores, associated equipment and production from the Bakken formation as described on Exhibit 'A'." R. Doc. 48-4, at 1. Exhibit A to the Purchase Agreement provides:

| Well Name | Working Interest % | Net Revenue Interest % |
|---|---|---|
| G L Thompson 8-34 | 91.6667 | 76.04167* |
| USA Ytteredahl 33-34 | 100.0000 | 87.5000* |

*limited to the Bakken formation found in both wellbores at footage depths between 9,800' and 10,350' only.

R. Doc. 48-4, at 3. The Purchase Agreement's reservation clause provides that "Berco expressly reserves and excepts all interests in the associated leasehold, contracts and easements including the right to develop and/or drill through the Bakken formation to produce oil and gas from other formations." R. Doc. 48-4, at 1. The natural reading of the Purchase Agreement's granting clause, reservation clause, and Exhibit A is that the parties intended to transfer only the wellbores.

The Assignment, however, contains different language. Its granting clause states that "[Berco] hereby assigns, grants, bargains, sells and conveys to [Armstrong] all of [Berco's] right, title and interest in and to the assets, properties, and production described on Exhibit 'A'." R. Doc. 48-6, at 1. Exhibit A to the Assignment provides:

|  | Working | Net Revenue |
| Well Name | Interest % | Interest % |
| G L Thompson 8-34 | 91.6667 | 76.04167* |
| USA Yttredahl 33-34 | 100.0000 | 87.5000* |
| Yttredahl 33-34 Minnelusa (unrestored location) | 100.0000 | N/A |

*limited to the wellbores, associated equipment *and production from the Bakken formation* found at footage depths between 9,800 feet and 10,350 feet only.

R. Doc. 48-6, at 3 (emphasis added). The Assignment's reservation clause provides that "[Berco] expressly reserves and excepts from this conveyance all interests in the associated leasehold, *other than the interests in the Bakken formation conveyed hereunder* and contracts and easements, including the right to develop and/or drill through the Bakken formation to produce oil and gas from other formations." R. Doc. 48-6, at 1 (emphasis added).

The limiting language from Exhibit A to the Assignment is ambiguous. Although it clearly conveys an interest in the two wellbores and their associated

equipment, the reference to "production from the Bakken formation" could mean either (1) all oil and gas produced from the Bakken underlying the property on which the two wells are located, regardless of whether it is produced through those two wells or through other wells (*i.e.*, a leasehold interest) or (2) the oil and gas produced from the Bakken through only those two wellbores (*i.e.*, a wellbore-only interest). The "other than" phrase in the Assignment's reservation clause—which provides that Berco reserves "all interests in the associated leasehold, *other than* the interests in the Bakken formation conveyed hereunder"—likewise does not make clear whether that nonreserved interest is limited to production through the two wellbores.

In sum, the combination of (1) the "other than" phrase from the Assignment's reservation clause (which does not appear in the Purchase Agreement's reservation clause) and (2) the limiting language of the Assignment's Exhibit A create an ambiguity. It is thus unclear from the face of the Purchase Agreement and the Assignment whether Berco conveyed to Armstrong only a wellbore interest or an interest in the underlying leaseholds as well.

Armstrong argues that the documents are not ambiguous. He highlights the Supreme Court of North Dakota's statement in *Miller v. Schwartz*, 354 N.W.2d 685 (N.D. 1984), that "it appears that the term 'working interest,' as commonly used in the oil industry, is generally synonymous with the term 'leasehold interest.'" *Id*. at 689. Armstrong argues that the presence of the phrase "Working Interest %" in Exhibit A to both the Purchase Agreement and the Assignment makes clear that he received a leasehold interest.

Armstrong reads too much into *Miller*. *Miller* did not hold as a matter of law that "working interest" means "leasehold interest," but rather commented that the terms are "generally synonymous." *Id*. *Miller* concerned a document entitled "Assignment of Working Interest," which referred to a working interest in two wells. The issue in *Miller* was whether the assignment unambiguously transferred a

leasehold interest when the "working interest" at issue was "more particularly set forth and described" by cross-reference to a previously recorded document. *Id.* at 687. It was undisputed that the cross-referenced document was the oil and gas lease that covered the property on which the two wells were drilled. *Id.* The North Dakota court ruled that the use of the term "working interest" with reference to the two wells did not, in itself, limit the conveyance to a wellbore interest when the rest of the relevant documents showed that the assignment transferred the assignor's entire interest in the lease. *Id.* at 689.

In this case, the term "working interest" is used in a different context. Other aspects of the relevant documents tend to show that the parties agreed to transfer only a wellbore interest. Even if the term working interest "generally" means leasehold interest, we do not think the North Dakota court meant to declare as a matter of law that parties to a contract necessarily use the term in that way, especially when other evidence suggests the contrary. Indeed, the North Dakota court itself acknowledged seven years after *Miller* that a deed conveying a "Grantor's working interest . . . in six producing oil and gas wells" was "ambiguous as to the specific nature of the interest . . . conveyed." *Minex Res., Inc. v. Morland*, 467 N.W.2d 691, 694, 696 (N.D. 1991); *cf. Plano Petroleum, LLC v. GHK Exploration, L.P.*, 250 P.3d 328, 329–32 (Okla. 2011). The district court thus did not contravene North Dakota law by concluding that the agreements between Armstrong and Berco were ambiguous.

2.

If a contract is ambiguous, extrinsic evidence is admissible to clarify the intentions of the parties. *Gawryluk*, 654 N.W.2d at 403–04. The district court made findings of fact after a bench trial, and we review those findings for clear error. *Thompson v. Thompson*, 391 N.W.2d 608, 611 (N.D. 1986).

The district court heard testimony from Armstrong and Rockne Mullens, Berco's Vice President of Exploration and Production, regarding their intentions. Mullens testified that Berco intended to convey only a wellbore interest. Had Berco intended to convey a leasehold interest, Mullens testified, the Purchase Agreement and Assignment would have been drafted differently. Both Exhibit As would have described the leases and the real estate covered by those leases, and Exhibit Bs would have been included to describe the transferred wells. Mullens also testified that the "Working Interest %" columns were intended to clarify Berco's interest in the two wellbores. Mullens said that Berco sold both wells because they were marginal producers and that the purchase price was equivalent to the cost of plugging, abandoning, and reclaiming the well sites. Armstrong testified that he had no oral discussions with anyone at Berco. He also testified that he believed the reference to "Working Interest %" meant "leasehold interest," but admitted that he never conveyed this understanding to anyone at Berco.

The district court also heard testimony regarding custom and usage from expert witnesses for both parties. The court noted that both experts agreed that

> the well-established custom and usage in the oil and gas industry indicates that if the parties intended to convey an interest in an oil and gas lease or leases, there would be not only a mention of the leases, but an adequate legal description of the property subject to the leases.

The district court found that "[c]ustom and usage, along with Berco's stated intention to convey only an interest in the two wellbores, demonstrate[s] that the" assignment from Berco to Armstrong "was intended as a wellbore-only assignment." This finding is not clearly erroneous; it was adequately supported by evidence in the record. We therefore affirm the dismissal of Armstrong's quiet-title claim, based on district court's conclusion that the Purchase Agreement and Assignment, taken

-10-

together, conveyed to Armstrong the "[w]ellbores, associated equipment, and production from the Bakken formation through the . . . [w]ellbores only."

B.

1.

To succeed on a trespass claim under North Dakota law, "the plaintiff must establish the defendant intentionally entered the land of another, or caused a thing or third person to do so, without the consent of the landowner." *Knutson v. City of Fargo*, 714 N.W.2d 44, 50 (N.D. 2006). "While actual harm is not one of the requisite elements to a claim for trespass, actual interference with another's property is." *Tibert v. Slominski*, 692 N.W.2d 133, 137 (N.D. 2005).

Armstrong showed only that he has an interest in the wellbores. He failed to show that he has any other interest in the minerals in and under the land on which the Yttredahl and Thompson wells are located. Because Armstrong does not assert that Encore interfered with his use of the two wellbores, his trespass claim was properly dismissed.

2.

Under North Dakota law, "[c]onversion consists of a tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner." *Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.*, 680 N.W.2d 634, 638 (N.D. 2004). Armstrong's conversion claim fails because he did not show that he had any interest in the oil and gas revenues from Encore's Charlson well. There was no evidence that the Charlson well produces oil or gas through the Thompson or Yttredahl wellbores. Because Armstrong has an interest in only the Thompson and Yttredahl wellbores, the

-11-

equipment associated with those wellbores, and the production through those two wellbores, the district court properly dismissed his conversion claim.

## III.

Armstrong contends that Encore breached the Letter Offer by refusing to assign to him a one-percent overriding royalty in the spacing unit from which Encore's Charlson well produces. He argues that the district court erred in ruling that the failure of one of the Letter Offer's conditions precedent—title review—precluded the creation of a contract between Armstrong and Encore.

Under North Dakota law, "[a] condition precedent may be a prerequisite to the existence of a contract." *Airport Inn Enters., Inc. v. Ramage*, 679 N.W.2d 269, 272 (N.D. 2004). "A condition precedent is a condition which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed." N.D. Cent. Code § 9-01-11. "The failure of [a] condition precedent is fatal to the existence of an enforceable contract for sale of the property." *United Bank of Bismarck v. Trout*, 480 N.W.2d 742, 748 (N.D. 1992).

Encore's Letter Offer expressly provided that it was "subject to title review." The phrase "subject to" is sufficient to create a condition precedent. *Kruger v. Soreide*, 246 N.W.2d 764, 768–69 (N.D. 1976). A title opinion is a "statement of opinion by an attorney . . . as to the state of the title to land, mineral, royalty or working interests." Williams & Meyers, *supra*, at 1144. "The opinion will often recommend that curative instruments be obtained before the property interest is purchased, drilled on, or otherwise dealt with." *Id*. As the district court put it, "a satisfactory title review was a condition precedent to the formation of a contract."

Armstrong contends that he satisfied any condition precedent because the title opinion procured by Encore never said that he did not receive a leasehold interest

-12-

from Berco. The title opinion, however, identified numerous "ambiguities and inconsistencies" regarding Armstrong's claim of title, and then merely "assumed" for purposes of its remaining analysis that Armstrong purchased "the entire leasehold working interest." The opinion plainly raised doubt about whether Armstrong received a leasehold interest from Berco, prompting Encore to state that it was unable to "tie the pertinent leases (leasehold) back to [Armstrong's] ownership," and that the Assignment "could be interpreted as a wellbore (only) assignment—limited to Bakken production from the [Yttredahl] well." To resolve the "ambiguities and inconsistencies," in Armstrong's claim, the title opinion called for Armstrong to take two curative measures: (1) provide Encore an assignment from Berco to Armstrong that clearly conveyed a leasehold interest in the NW/4 of Section 34 and (2) submit that assignment to the federal Bureau of Land Management for its approval. Encore's title review was therefore not satisfactory until Armstrong took the required curative measures.

Armstrong contacted Berco in an attempt to clarify that his interest in Section 34 was not limited to the Yttredahl wellbore. Berco responded that its agreement with Armstrong "was a wellbore assignment only." Armstrong also contacted the federal Bureau of Land Management, but the agency concluded that Armstrong received a wellbore-only interest. Armstrong's inability to undertake successfully the curative measures required by the title opinion resulted in the failure of the condition precedent.

Armstrong argues finally that because the Letter Offer calls for him to transfer whatever right, title, and leasehold interest he held to the NW/4 of Section 34, he complied with its terms by transferring his wellbore-only interest in the Yttredahl well. The Letter Offer viewed as a whole, however, makes clear that the document required Armstrong to transfer both his "right, title and interest in and to the USA-Yttredahl # 33-43" and his "leasehold interests . . . in the NW/4—Sec. 34." That is, the Letter Offer required Armstrong to transfer both an interest in the Yttredahl well

-13-

and a leasehold interest in the NW/4 of Section 34. Because Armstrong had no leasehold interest to transfer, he could not comply with the Letter Offer. The district court correctly dismissed the breach of contract claim.

IV.

Armstrong's final argument is that the district court erred by declaring the altered, recorded Assignment null and void. It is undisputed that before Armstrong recorded the Assignment, he amended Exhibit A by adding a fourth column. The new column provided a description of the properties on which the Thompson and Yttredahl wells were located. The recorded Exhibit A provided:

| Well Name | Working Interest % | Net Revenue Interest % | **McKenzie County, ND** |
|---|---|---|---|
| G L Thompson 8-34 | 91.6667 | 76.04167* | **SE/4 8-153-95** |
| USA Yttredahl 33-34 | 100.0000 | 87.5000* | **NW/4 34-154-95** |
| Yttredahl 33-34 Minnelusa (unrestored location) | 100.0000 | N/A | |

*limited to the wellbores, associated equipment and production from the Bakken formation found at footage depths between 9,800 feet and 10,350 feet only.

R. Doc. 48-7, at 3 (boldface added). Armstrong asserts that his amendment was justified because it was necessary for proper indexing of the Assignment and was anticipated by the parties. He also contends that the amendment was harmless because he could not have succeeded to any greater interest than what Berco held before the assignment.

Under North Dakota law, a grantor of property must subscribe to the grant and acknowledge the execution before the deed is recorded. N.D. Cent. Code §§ 47-19-03, 47-10-01. The failure of a grantor to re-sign and re-acknowledge a deed that has

-14-

been altered by the grantee renders that deed null and void on its face. *Johnson v. Hovland*, 795 N.W.2d 294, 301 (N.D. 2011). The parties do not dispute that Armstrong unilaterally altered the exhibit without Berco's consent. Neither Armstrong's proffered justifications for altering the exhibit, nor the alteration's purported harmlessness, excuse Armstrong's noncompliance with the rules governing grantors. Therefore, the district court correctly ruled that Armstrong's unilateral alteration of Exhibit A before recording it rendered the recorded Assignment null and void.

\* \* \*

The judgment of the district court is affirmed.

_____